WILLIAM H. ROBERTSON and others *v.* FRANCISCO DE PAULO DE LIZARDI and others.

Where the fact of a partnership is clearly shown, and that the bills of exchange sued on were drawn for the purpose of carrying on the business contemplated by the parties, plaintiffs will not be required to show, that they knew of the existence of the partnership when they took the bills.

Where for a limited period, and in relation to a particular branch of commerce, defendants were to buy and sell on joint account, and to participate in the profits, they become, as to third persons, partners in relation to that trade.

Robertson and others v. De Lizardi and others.

There are cases in which the parties, though not partners *inter se*, will be held liable as such towards third persons.

APPEAL from the District Court of the First District, *Buchanan*, J.

This was an action by the plaintiffs, composing the firm of Robertson, Beale & Co. of Mobile, on two bills of exchange, amounting together to £1800 sterling, drawn by A. Mackenzie & Co. of that city upon the defendants, F. de Lizardi & Co., and protested for non-acceptance and non-payment. The bills were dated the 16th and 17th February, 1837. The petition alleges : That on the 17th August, 1836, the defendants gave a letter of credit to A. Mackenzie & Co., their correspondents, authorizing the latter to draw upon them to the extent of 12,000*l.* sterling, the credit to be. extended under certain circumstances mentioned in the letter : That the said letter, contained in addition, propositions for the formation of a partnership between the defendants and A. Mackenzie & Co., during what is commonly termed the cotton season, of 1836—1837, which propositions were accepted by the latter, and became thereby obligatory on the defendants : That two other letters of defendants, dated Oct. 20th, 1836, and 2d March, 1837, confirm the first letter of 17th August, 1837 : That the letter of 17th August, 1837, was shown to the petitioners, who, on the faith of it, purchased the two bills sued on, for which they gave 350 bales of cotton, which were subsequently sold by the defendants for the joint account of A. Mackenzie & Co., and themselves. Judgment is prayed for amount of the bills, with interest and costs, against the defendants, *in solido.*

The defendants, after a general denial, allege that the bills were taken upon the general credit of the drawers, and not on the faith of any letter of credit from them. They aver that if their letter of credit was ever communicated to the plaintiffs, the latter must have been aware, that A. Mackenzie & Co. had not, at the time the bills were taken, any authority to draw on them, or to make any shipments of cotton to them on joint account ; that the bills were not drawn pursuant to the authority originally given ; and that the limit of the credit had been, at the time, already greatly exceeded.

The letter of the 17th August, 1836, is in the following words :

"*London, 17th August,* 1836."
" Messrs. Alexander Mackenzie & Co.

"Gentlemen :—Having had the pleasure of becoming ac-
quainted with your prior, and communicating freely with him
our ideas respecting the great staple of your State and city, we
have thought that by careful attention to the cotton business at
both ends, that is, in Mobile in buying, and in Liverpool in sell-
ing, and keeping down the expenses in both places as much as
possible, a fair business might be done. With the view there-
fore to the operations which we shall presently explain, we now
enclose three letters of credit, one addressed to each of the three
banks of Mobile, for the sum of four thousand pounds sterling,
or twenty thousand dollars each.

It is understood that these credits are to be used exclusively :
*First.* For the purchase of cotton on our joint account and equal
account with you. On such purchases it is understood and
agreed upon, that no charge beyond actual disbursements is to be
made, either for buying in Mobile, or for selling in Liverpool.
Advice to be regularly given so soon as a purchase is made, and
subsequently as to shipment, &c. ; and in all cases the cotton,
while on shore, to be insured against fire, and timely notice given
to us for the marine insurance.

*Second.* These credits may be employed as advances to par-
ties disposed through your influence to consign to our house in
Liverpool ; in which case we trust, that by examination as to
quality, and a moderate scale of advances, little risk of heavy
reclaims will be incurred ; and it is understood betwixt us
that you are at liberty to take an interest of $\frac{1}{3}$ or $\frac{1}{2}$ in such
shipments, and of your proportion we shall consider ourselves
equally interested with you, although it be not so stated in the in-
voice, as we shall in such cases charge the usual commissions in
Liverpool, and credit you with one-half of same.

*Third.* For these two objects the above credits are solely to be
employed, and if an extension of them be required, please imme-
diately to advise our friends in New Orleans, Messrs. M. De Li-
zardi & Co., who will open such further credits with such banks

as you may name, and to such extent as the probable business may require. It has also been agreed upon betwixt us, and your prior, that we shall do what we can to influence orders for purchases of cotton, and also consignments of salt, coals, cotton-bagging, &c., to your house, and that the commissions accruing from these sources are to be set against those which we may derive from consignments through your influence : and the commissions on both sides, at the close of each year's business, are to be made up and ascertained, and the whole equally divided betwixt us and your house, so that the advantages may be equal and reciprocal.

This agreement to be in force for the present season; to be renewed hereafter, if mutually agreeable.

We say nothing, at present, as to prices or prospects, but shall endeavor to keep you advised of what is going on in Liverpool; and will thank you, in like manner, to give us regular advice of how matters are going on your side. It is understood that Mr. Berthoud shall not charge more than $\frac{1}{2}$ per cent, for accepting and paying your drafts, and negotiating on us, when that course is found most beneficial.

Most sincerely, gentlemen, yours,<br>F. DE LIZARDI & Co."

The letter of the 20th October, 1836, after expressing the conviction of the defendants that the price of cotton must be lower in a few months, from the derangement of the currency, and other causes, proceeds : "We should therefore recommend to you, if your market opens high, to be a looker on for some time, for by the month of February, March, or April, we have little doubt the accounts from hence will bring high prices on your side to a reasonable rate." In their letter of the 2d March, 1837, after stating that their anticipations, expressed in the letter of the 20th of October, preceding, had been more than realized, and declaring that the condition of the money market "must tend still further to reduce the price of all commodities, and cotton among the rest,' they say : "We shall be thankful if your purchases, on joint account, are limited to those which you announce for Dalhousie Castle and John N. Gossler, together 746 bales, for we cannot hold out the hope to you of getting out of them, without a heavy

loss. We shall not wish during the present season to extend operations beyond the direct credits furnished your Mr. Mackenzie."

There is an admission in the record, "that one of the partners of A. Mackenzie & Co. being in New Orleans in the early part of the year 1837, applied to the firm of M. de Lizardi & Co. to obtain an extension of the credit of 12,000*l.* sterling, given to them on the Mobile banks, and that it was refused on the ground, "that the then state of business and commercial affairs, did not render such an extension advisable."

It was proved, that the defendants accepted drafts drawn by A. Mackenzie & Co. to an amount exceeding 16,000*l.* sterling.

There was judgment below in favor of the plaintiffs. The defendants are appellants.

*L. C. Duncan,* for the plaintiffs, contended that the defendants and A. Mackenzie & Co. were partners, and liable as such to plaintiffs, citing *McDonald* v. *Millaudon,* 5 La. 403. 5 Peters, 561. 3 Kent's Comm. 27. 3 Peters, 428. Gow on Partnership, p. 17, 176. Story on Partnership, chap. 4, sect. 64, p. 96.

*Grymes,* on the same side. The only question which this case presents, is, did a partnership exist between Mackenzie & Co. and the defendants, which would make both liable to third persons, for debts contracted within the sphere, and in relation to the business contemplated by the partnership?

The plaintiff holds the affirmative of this proposition.

In order to understand it fully, and make a just application of the principles of the law of partnership, we must ascertain with precision the facts of the case, as they are to be found in the record. The material facts lie in a very small compass.

The basis of the whole matter is the letter of the defendants to A. Mackenzie & Co., dated London, August 17th, 1836.

It establishes : 1st. That there was an agreement between the parties to buy and ship cotton at Mobile, which was to be sold in England. That this was to be done on joint account of both parties, and both were to share equally in the *profits* arising from the business.

2d. That the party in Mobile, was to procure consignments of

cotton to the party in England, to be sold on commission, in the profits of which they were equally to participate.

These two objects embrace the whole range, or extent of the ordinary business of a commission merchant, or cotton factor, in the southern ports of the United States.

3d. As a capital to commence these operations upon, a credit of 12,000*l.* is furnished upon three banks in Mobile, in equal sums.

The letter states that, "for these two objects, the above credits are solely to be employed. And if our extending them be required, please immediately to address our friends in New Orleans, Messrs. M. de Lizardi & Co., who will open further credits with such banks as you may name, and to such *extent as the probable business may require.*" The court must see, at once, that the terms of this letter are totally at war with the idea insisted upon by the defendants, that the whole business was to be limited to the original credit of 12,000*l.* It makes express provision to extend the business beyond that, and to an indefinite amount; " to such an *extent* as the *probable* business may require."

To whose discretion was this left? Mobile was the place where the whole business was to have its commencement. Mackenzie & Co. alone could judge, or know any thing about the probable amount of the capital that might be wanted, or the extent of the business; and to them was left then aming upon whom the credits should be furnished.

The most favorable construction of this letter for the defendants, could amount to no more than this : that it pointed to a *manner* of procuring the necessary funds to carry on the operations agreed upon ; and it is submitted to the court, with great confidence, whether the *modus operandi*, or manner of raising the funds to accomplish the objects of the partnership, can in any manner affect the rights of third persons.

The drawing of bills of exchange is the usual, and, perhaps, the only mode by which funds can be raised for such purposes. The reason why they were sold out of doors, as it is called, in preference to selling them to the banks, is well explained by Brogden in his deposition. He says, the banks would give but seven per cent premium, and individuals out of doors paid ten. The court can-

not fail to see at once, the great advantage this was to the parties who were to share the profits, and the exercise of a most sound discretion on the part of the partner entrusted with the management of this part of the business?

The plaintiffs confidently assume, that this evidence establishes an agreement between the parties to carry on the business of purchasing and shipping cotton in Mobile, and of making advances on the shipments of cotton to the defendants for sale on commission, for the mutual advantage of both, and in the profits of which both were to participate; and they submit to the court, that this, in law, constitutes a partnership which renders them, both, liable to creditors and third *persons*, upon all obligations contracted in the usual course of such business.

This position is no where contradicted by any competent, legal, or credible evidence to be found in the record. Every thing on the contrary, tends to strengthen and corroborate it.

The next letter, dated London, October 20th, 1836, contains nothing opposed to this. It is couched in language that would most naturally be used by one party to the other, whose interests were joint and common in the matters treated of.

The third letter, dated 2d March, 1837, still more strongly confirms the relative position of the parties as assumed by the plaintiffs. Its language is: " We shall be *thankful* if your purchases on joint account are limited, &c." No doubt is expressed of the right to extend the purchases further; no limit is laid down; no hint is given that there had been any specified limit fixed or agreed on; and no intention is expressed, or right asserted, to repudiate any operations beyond any specific limits.

One of the co-partners—and he to whom the discretion was necessarily left—does purchase and ship on joint account the cotton purchased with the proceeds of the bills of exchange in question.

It is not denied, and the whole evidence in the case proves it, that the bills were drawn, and the proceeds used in the purchase of cotton thus shipped; the very business contemplated by the partnership.

It is clearly proved that the defendants, who now pretend a limitation to the original credit of 12,000l., did actually accept bills to the amount of 16,000l. and largely upwards; and we

never hear of any repudiation, on their part, until all the operations are ended—the last parcels of cotton shipped, the bills drawn, and then, in the face of a losing market, we hear, for the first time, of an intention to evade payment.

The plaintiffs insist, that it is only necessary for them to show the existence of a co-partnership; the business to which it related; that their claim is founded on a transaction within the usual scope of that business; and that no understanding between the parties as to limits, or the manner of doing the business, and known only to themselves, can in any way affect the plaintiffs' claim.

They confidently believe, that they have proved a partnership between the parties, embracing the most important branch of the mercantile business of this country, to the whole of its usual extent; in such a manner, as to fix their joint and several liability to all third parties, or creditors, whether they were *known* as partners at the time the obligation was contracted, or the debt created, or *not;* and whether the partnership was in the *capital stock, or in the profits, or in both.* See Story on Partnership, p. 74, sec. 49, p. 81, sec. 53, p. 82, sec. 54, 55, 56, 57, 58, 59, 60, 61. Ib. p. 155, sec. 103, and the authorities there cited. 3 Kent's Com. p. 23. The learned commentator, first referred to, has cited all the authorities that can be brought to bear on the subject. It would be a useless parade of research, here again, to cite and comment upon them. They have, however, been carefully referred to and examined, and will be found most fully to sustain his doctrine.

The same doctrine is very forcibly laid down by Mr. Justice Washington. He says: "The responsibility of one partner for the contracts of another, is not solely on the ground of the *credit being given to all*, which it is not, in the case of a *dormant partner*, but because, that being to share in the *profits*, he must share in the loss. 1 Wash. C. C. Rep. 492. 2 Ib. 388. The whole of the plaintiffs' case is embraced, and the principles applicable to it most ably laid down, by the late Chief Justice Marshall, in delivering the opinion of the Supreme Court of the United States in the case of *Winship* v. *The Bank of the United States*, 5 Peters' Rep. 352. And all the principles applicable to this case are con-

curréd in by Mr. Justice Baldwin, the only one of the court, dissenting in some respects from the judgment rendered. This court, in the case of *McDonald* v. *Millaudon*, has reiterated and consecrated all these principles, referring to the case from Peters, sustaining its authority, and the soundness of its doctrine.  5 La. Rep. 403.  The last cited case is a very strong one.  I was engaged in it for the defendant, and the facts are familiar to me. There was no evidence from which to infer any knowledge, on the part of the plaintiff, of the connection between .Millaudon and Flower, or that credit was given on that account.  On the contrary, it was proved that the plaintiff's goods went into the hands of Flower before that ·connection existed in fact ; and this court had already decided that, as between Millaudon and Flower, there was no partnership, to which decision it has since adhered.  The case was, therefore, decided purely upon the principle of the liability of *secret or dormant partners* to third persons, when discovered, arising from their right to share in the profits.  In addition to all which, the court is referred : 1st, to the charge of a very able New York judge .to the jury, in a case against the same defendants, arising out of a transaction exactly like this, between the same parties, and upon the same evidence, in which there was a verdict and judgment for the plaintiffs.  And 2d. to the judgment of the Supreme Court of the same State, affirming this partnership to have existed as charged by the plaintiffs in this case, and establishing the liability of the defendants as partners. *De Lizardi et al.* v. *Beers*, reported by Mr. Hill.

In summing up this case, we may then safely say ; that all the authorities recognize the liability of *secret* or dormant partners, when discovered, to creditors.

But if, as the defendants contend, they must be known, and the credit given on the faith of their liability, it is obvious that the moment they are known, they are no longer secret or dormant partners ; and if the defendants are right, such a case cannot exist, and all the learning in the books, on the subject, may as well be stricken out, and the world relieved from a mere delusion under which it has been long laboring, on the faith of judicial decisions and the labors of learned commentators.

The truth is, that all the difficulty in the case has arisen from

an error of the defendants' counsel in treating the subject as one of agency : the agent acting under known special instructions, within certain prescribed limits, and in a manner defined and laid down for his government.

Such a case we humbly conceive bears no resemblance to this.

There is no doubt, that the law of partnership involves, to a certain extent, the law of agency. Indeed, it is difficult to conceive any branch of the law that does not embrace certain things that are common to all.

That partners are, in some sense, mutual agents for each other is true. But the dividing, or diverging point, between mere agents, and partners having a joint interest in mercantile business, is easily perceived. The jurisprudence, and the universal understanding of the whole world, has fixed it.

The absurdity of confounding these two branches of law, throughout their whole extent, and to their ultimate results, is too obvious to need argument or illustration.

The responsibility of partners for each other, rests upon principles that have been long settled, for the common convenience and good of society. It is so stated and fully illustrated by the authors that have been quoted ; and it is confidently hoped that they will not now be unsettled, or brought into doubt.

*G. Strawbridge,* for the appellants. The plaintiffs never saw the letter of credit of 17th August, till long after they had taken the bills. Passing over this part of the case, merely referring the court to the case of *The New Castle Manufacturing Company* v. *The Red River Rail Road Company,* 1 Robinson, 145, let us take the plaintiffs' own statement, that they saw the letter of the 17th August before they took the bills, and that they took them on the faith of that letter. Now, the relations of partners, as between themselves, are, like other contracts, regulated by their intentions. Pothier declares them to be reciprocal mandatories. Obligations, Cont. de Societé, 71 and 89. Story on Partnership, 261, &c. These duties and responsibilities are the same as those of agents. If A. and B. horse dealers, agree not to warrant, and A. sells with warranty, both are liable ; but A. is responsible to B. for the breach of their agreement. Gow. Story, *ut supra.*

For the ease and security of trade it is held, that as regards

third persons, the responsibility of partners is not restrained by their private arrangements, as in the case of the horse dealers above stated ; and the reason given is, " *because the public cannot be conusant of their private arrangements ;*" from which it results, as a corrollary, that where such third person has knowledge it does affect his contract; and the same author is to that effect, p. 57, 65, 69, 164. See also Collyer, p. 243. 3 Kent, 27. 5 Pick. Rep. 11. 412. Indeed the principle is one of plain morality, running through all our laws. The taker of a negotiable note, with notice, loses all protection from its negotiable character. The person who deals with an agent, aware of his exceeding his authority—the purchaser or mortgagee aware of the existence of a mortgage not recorded—are all brought under the rule, and therefore they only stand in place of their *ayantcause*, or he from whom they derive title.

I shall therefore examine the case. as though it were between McKenzie & Co. and De Lizardi & Co. Neither of these parties imagined they were forming a general partnership. If they are now found in such a position, it is from an erroneous opinion, not uncommon among mercantile men, that there is no partnership where none is expressed; and who do not understand, that partnership is presumed by law as the result of certain acts, such as sharing profits. But this again, is a consequence deduced in favor of third persons dealing with them, without knowledge ; for, as between themselves, there may be an interest in profits without partnership. I lend A. $1000, without interest, but he pays me in lieu half his profits ; but I share no loss.

Lastly, let us look at the case under the aspect it is supposed to have been presented, in New-York, in the case referred to by plaintiffs' counsel, and in its least technical and most liberal and equitable view. The learned Judge who decided that case, found that beyond the clause in the letter of 17th August giving the credit of 12,000*l.* there was a general power to draw to any amount, and this conclusion is mainly based upon the concluding clause of that letter. It is understood that, " *Mr. Berthoud shall not charge more than one-half per cent. for accepting and paying your drafts and negotiating on us when that course is found most beneficial.*" Who is Mr. Berthoud ? Where does he live ?

What were his relations to the parties? What was his authority or what his instructions to accept and pay? To what amount, or why was he to do it at all?

For any thing we can gather from the record before us, we are in the dark, and it seems to me if the learned Judge had no more information than it presents, the plaintiffs were very deficient in their proof, about a very important matter which it was their duty to explain. But let us put it on the most favorable footing for them. Let us suppose that Mr. Berthoud was a merchant residing at New York, a correspondent of the defendants, perhaps an agent. It was within the power of the plaintiffs to have obtained his testimony—to have made him produce his correspondence with and instructions from Lizardi; and they have nor ight to ask the court to eke out testimony they did not make an effort to procure. The presumption is, that the testimony was against them. But what does it amount to? The plain language of the clause is this: If you find it more beneficial to draw on New York—if the rate of exchange is higher or demand greater, do so—and Mr. B. will accept your drafts and reimburse himself by drawing on us, for which he will charge no more than one-half per cent.

Here is no new authority for an extended credit. Any extension was to be obtained through the New Orleans house. It is plainly another mode of using the first credit. *If you find it more beneficial.* More beneficial than what? More beneficial than drawing through the Mobile banks. To what amount? Certainly the same it was substituted for. How can we reconcile a credit for 12,000*l.* on a bank with right to draw on another bank or individual, "if more beneficial," with the latter's being for an unlimited amount. Our Code, art. 1954, providing for the interpretation of contracts, declares: "However general be the terms in which a contract is couched, it extends only to the things concerning which the parties intended to contract." The parties were here speaking of the credit of 12,000*l.* This, and its renewals, were the means designated for their operation; the drafts through Berthoud, an alternative mode of using the same means.

BULLARD, J.* A re-hearing was allowed in this case, and we

---

* MORPHY, J., having been of counsel in this case, did not sit on its trial.

have attentively and deliberately considered the arguments adduced by the parties.

The controversy appears to us to turn upon the question ; whether the partnership between McKenzie & Co. and the defendants, as evidenced by the letter of the latter of the 17th of August, 1836, still existed at the date of the bill of exchange, and whether they were drawn in relation to the business of the partnership : for we cannot doubt that a partnership did exist between the parties, in the cotton trade between Mobile and England, in which the parties were to divide the profits ; but whether it ceased as soon as the fund provided, through the Mobile banks, was exhausted, and the house of M. De Lizardi & Co. of New Orleans declined furnishing any further credits, forms the main question in this cause.

The whole of the letter must be taken together. After explaining the nature of the trade in which they are about to embark, on joint account, and stating that letters of credit to the Mobile banks are enclosed, to the extent of twelve thousand pounds sterling, they say : " For these two objects the above credits are solely to be employed, and if our extension of them be required, please immediately to address our friends in New Orleans, Messrs. M. De Lizardi & Co., who will open further credits with such banks as you may name, and *to such an extent as the probable business may require.*"

This shows, that the defendants did not contemplate a limitation of the capital to be advanced by them in the business, at the twelve thousand pounds. Nor does it appear that they intended it should depend upon the will of M. De Lizardi & Co., to put an end to the concern, by declining to open further credits. And what was the *probable business* to which the defendants allude, and which was to form the limit of the new credit ? It was the cotton business, during the season, the purchase in Mobile, and the sale in England, for joint account. Suppose the defendants, instead of referring to their friends in New Orleans to open further credits, had directed McKenzie & Co. to write to them, and that they would open further credits, commensurate with the probable business undertaken by them, it would have been a promise to permit such further credits, instead of a limitation to the sums

already advanced. This view of the matter is greatly corroborated by another clause in the letter, which escaped our notice on the first argument of this cause. It is towards the close, in which they say : " It is understood that Mr. Berthoud will not charge more than one-half per cent. for accepting and paying your drafts, and negotiations on us, when that course is found most beneficial." Now, it is. asked, who is Mr. Berthoud ?    To this it may be answered, that the record does not inform us : but he was, certainly, a person indicated by De Lizardi & Co. as willing to facilitate the negotiation of bills, for the joint benefit of the parties, and that McKenzie & Co. were at liberty to resort to that means of raising money, if they found it most advantageous.    This repels the idea of a limitation as to amount, as stated in the letters of credit addressed to the banks in Mobile ; because, it left it to the judgment of McKenzie & Co. to draw through Berthoud, or to apply to M. De Lizardi & Co. for further credits.

But the letter says in express terms :  " This agreement to be in force for the present season, to be renewed hereafter, if mutually agreeable."   Now, the agreement related to the purchase and sale of cotton, on joint account ;  and the mutual or reciprocal recommendations of consignments, in the commissions upon which, the parties were to participate.

It would appear also, from the correspondence between the parties, that the defendants did not consider the authority of McKenzie & Co. to purchase on joint account, as limited, originally, to the sum of twelve thousand pounds.   In a letter of the 2d of March, 1837, they speak of the great derangement in the money market, of the want of confidence, and of the danger of further depression in the price of all commodities, and cotton among the rest ; and they say : " We *shall be thankful* if your purchases on joint account are limited to those which you announce as per Dalhousie Castle, and John R. Gosslin, together, 746 bales, as we cannot hold out the hope to you of our getting out of them without a heavy loss ; although you may rely, that every exertion to this effect will be made."   They add : " We shall not wish, during the present season, to extend operations beyond the direct credit forwarded your Mr. McKenzie, &c."

The bills of exchange on which this action is brought, had al-

ready been drawn at the date of this lettter.    It is further shown that cotton, to the amount of more than the twelve thousand pounds, was sold by the defendants on joint account; although the cotton, purchased with the proceeds of the bills in question, was, in point of fact, sold for the particular account of McKenzie & Co.

The fact of a partnership being clearly shown, and that the bills were drawn for the purpose of carrying on the business contemplated. by the parties, it does not appear to us, necessary for the plaintiffs to show that they knew of the existence of the partnership, at the time they took the bills; and the circumstance, that the letter of the 17th of August was not communicated to the plaintiffs, until after the bills were drawn, does not appear to us material.    The parties certainly contemplated a participation in the profits of the cotton trade during the season, and that is sufficient to constitute them partners, as to third persons dealing with them, or either of them, in relation to that branch of trade.   Story on Partnership, sect. 55, 103.    3 Kent's Commentaries, (1st edition,) page 17.  ·

It is, however, contended by the counsel for the defendants, that the parties never contemplated a general partnership; and he infers this from their having assumed no social name, from there being no capital provided, no partnership books opened, no provision make for expenses, and because no such thing is named in their correspondence.    Let it be admitted that all this is true, and that there was not, between the defendants and McKenzie & Co., a regular, formal, and general partnership; yet the moment it is shown that, for a limited period, and in relation to a particular branch of commerce, they were to buy and sell on joint account, and participate in the profits, they became thereby, as to third persons, partners in relation to that trade.   There may be cases in which, in point of fact, the parties are not partners *inter se;* and yet, are held liable, as such, towards third persons dealing with one of them.    This was the doctrine recognized by this court in the case of *McDonald* v. *Millaudon,* 5 La. 409.

In that case, Millaudon was to receive a portion of the profits in the concern of Flower & Co., in the shape of interest over and above ten per cent, upon an advance of money to the firm.    As

between themselves, Flower and Millaudon were not partners ; but the latter was held liable towards third persons, 5 Peters, 561.

In the case now before the court, McKenzie & Co., and the defendants, in the settlement of the concern, admit, that upwards of sixteen thousand pounds sterling were employed in their joint operations ; the whole of which was raised by bills of exchange drawn on the authority of the letter of the 17th of August, 1836. The bills in question were drawn in the course of the same trade ; and before any intimation had been given, that De Lizardi & Co. were not inclined to extend the business on joint account, beyond the amount of the original credit. Notwithstanding our first impressions, we are now satisfied, that, although that letter was not communicated to the plaintiffs when the bills were drawn, so as to bind the defendants to an acceptance of those particular bills, or to amount to an acceptance beforehand ; yet the partnership being shown, and the transaction being in relation thereto, the defendants are liable.

*Judgment affirmed.*