**In the Matter of the Complaint of CHINA UNION LINES, LTD., as Owner of the STEAMSHIP UNION FAITH for Exoneration from or Limitation of Liability.**

**Civ. A. No. 69–874.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Sept. 21, 1971.

Joseph W. Nelkin, New Orleans, La., for Crescent River Port Pilots Assn.

Maurice L. Burk, Burk & Burk, New Orleans, La., for Huang Chen Pao-Hua et al.

Samuel C. Gainsburgh, Kierr, Gainsburgh & Benjamin, New Orleans, La., for Shi-Mi-Mei Cheng et al.

George Matthews, Lemle, Kelleher, Kohlmeyer, Matthews, & Schumacher, New Orleans, La., for C. & G. Boat Co.

H. Barton Williams, Deutsch, Kerrigan, & Stiles, New Orleans, La., for American Motorist Ins. Co.

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THIS COURT'S ORDER GRANTING THE MOTION OF CRESCENT RIVER PORT PILOTS ASSOCIATION, DEFENDANT, AND THE INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT OF PILOTS GLENN F. ADAMS THROUGH JAMES D. WINSTON, INDIVIDUAL DEFENDANTS

COMISKEY, District Judge.

On April 6, 1969, the S/S UNION FAITH was in collision with the tow of the Tug WARREN DOUCET in the Mississippi River at New Orleans, Louisiana resulting in loss of life, personal injuries and extensive property damage. At the time of the collision Kenneth H. Scarbrough, Jr., a commissioned Crescent River Port Pilot and a member of The Crescent River Port Pilots Association, was serving as pilot of the S/S UNION FAITH. Pilot Scarbrough has been missing since the collision and is presumed dead.

Subsequent to and as a result of the collision, claims were made and a multitude of actions were filed in this Court by the various interests involved including actions by the several vessel interests for exoneration from or limitation of liability. Among the several actions brought were those by the injured crew members and the survivors of the deceased crew members of the UNION FAITH (Civil Action 70–821 and 70–2337), as well as by the owners and underwriters of the Tug CAT & MITCH (Civil Action 70–806) against the estate of Pilot Scarbrough and the Crescent River Port Pilots Association, the latter having been alleged to be, " . . . an organization, partnership, association or other legal entity organized under the laws of the State of Louisiana" responsible along with Pilot Scarbrough for the latter's tortious acts. Following service of process, the Crescent River Port Pilots Association appeared, and, by answer, alleged that it was a Louisiana corporation of which, " . . . nearly all licensed and commissioned Crescent River Port Pilots are stockholders", and which " . . . performs certain functions for the account of its stockholders, which functions consist of providing a joint vehicle for the ownership and operation of pilot station, pilot books and pilot equipment, providing central facilities for receiving orders for piloted services, affording an orderly system of dispatching pilots to vessels requiring such services, providing a cen-

tralized billing and bill collection service, and providing for the uniform and orderly administration of the affairs of the individual pilots who pilot specific vessels over the pilotage waters."

Following completion of initial discovery by way of interrogatories propounded to it, the defendant association moved for summary judgment on the ground that, as a matter of law, it was not and could not be held legally liable for the negligent acts or omissions of an individual pilot member of the association. Thereafter, the several plaintiffs, with leave of Court, filed supplemental and amended complaints joining as additional parties defendant each of the Crescent River Port Pilots who, together with Pilot Scarbrough, were fellow stockholding members of the Crescent River Port Pilots Association at the time of the collision. The several plaintiffs allege and contend that this collective group of individual pilots, separate and apart from the corporate entity known as the "Crescent River Port Pilots Association", constitute an "ordinary" partnership under Louisiana law by reason of which each of the individual pilots of that partnership may be held liable for his proportionate share of the damages allegedly caused by the negligence of their co-partner, Pilot Scarbrough. The pilots appeared individually and moved for summary judgment dismissing the actions brought against them adopting in support of their motions the identical contentions advanced and legal position taken by the corporate Crescent River Port Pilots Association in connection with its motion for summary judgment.

After considering the pleadings, the documents and depositions filed in connection with the motions for summary judgment and following a hearing on those motions, the Court, by minute entry of March 12, 1971, granted the motions for summary judgment of the Crescent River Port Pilots Association as well as those of the individual pilots and now, in connection with its grant of such motions makes the following:

## FINDINGS OF FACT

### 1.

On April 6, 1969 and at the time of the collision between the S/S UNION FAITH and the tow of the Tug WARREN DOUCET in the Mississippi River at New Orleans, Kenneth H. Scarbrough, Jr. was serving as pilot of the S/S UNION FAITH.

### 2.

At the time of the collision Kenneth H. Scarbrough, Jr. was a commissioned Crescent River Port Pilot having previously received his commission from the Governor of the State of Louisiana on December 28, 1961, following examination by and upon the recommendation of the Board of River Port Pilot Commissioners, a quasi-governmental agency of the State created by statute and invested with authority to recommend to the Governor of the State the granting of commissions to deserving applicants and to institute disciplinary procedures against Crescent River Port Pilots for dereliction of duty.

### 3.

At the time of the collision Pilot Scarbrough was also a stockholding member in good standing of the Crescent River Port Pilots Association, a purely voluntary private organization, whose members, by virtue of its charter and not any law are all commissioned Crescent River Port Pilots. In the conduct of their affairs, the association, as well as each of the individual pilots are entirely independent of, have no legal connection with nor are they collectively subject to the control of the Board of River Port Pilots Commissioners.

### 4.

The corporate entity, Crescent River Port Pilots Association, is a Louisiana business corporation with its principal office in New Orleans and with a "pilot station" at Pilottown, Louisiana. As previously mentioned, it is a purely voluntary private organization composed of commissioned Crescent River Port Pilots

only. However, the holding of a commission from the Governor alone does not automatically entitle a Crescent River Port Pilot to become a shareholding member in the corporation. Likewise, a shareholder in the corporation may be divested of his stock ownership and expelled from "membership" by a vote of the other shareholders and, yet, continue to retain his commission and work as a licensed Crescent River Port Pilot.

### 5.

The corporate entity itself, as distinguished from the individual stockholding members, has title to the several pilot boats utilized by the pilots and employs the boat personnel to operate them. It maintains and operates the "pilot station" at Pilottown. It provides living accommodations for the pilots collectively, buys their food and employs personnel to prepare and serve it. Further, it operates the New Orleans office and employs all necessary personnel to perform the numerous accounting, clerical, and administrative functions for the pilots collectively.

### 6.

By general rules and custom, privately formulated, and not required by any law, the pilots collectively and individually, have assigned to the corporation their statutory pilotage fees, which are administered by the corporation. In this connection each month from the total fees remitted to the corporation on account of pilotage services performed there is deducted the monthly "overhead" of expenses for office supplies, telephone and telegraph tolls, postage, legal and accounting fees, insurance premiums, pensions, fees and subscriptions, public relations, travel expenses, advertising, entertainment, transportation, radio repairs, meeting and elections, repairs and maintenance of the "pilot station", boat repairs, office repairs and maintenance, salary and wages of corporate employees, rent, interest on loans, storm losses and depreciation.

### 7.

Each month, and after deduction of the "overhead" expenses mentioned above, the net income is distributed among the several pilots belonging to the association on the basis of an agreed-to formula. The net income is calculated and distributed on the following basis: The number of "working" (not necessarily calendar) days of all of the pilots in the month in question is totaled; this total is divided into the total "net" income of the entire group and a "daily rate" of pay for that month is determined; this "daily rate" is then multiplied by the number of days that each pilot member of the association worked during the month and that product, less any fines levied against him for infraction of the pilot's own private rules, is the pilot member's distributive share of the monthly net profits.

### 8.

Pilotage fees from the vessels are computed upon the tonnage of the vessel and other factors rather than upon the fact that there is a pilot aboard. What a pilot receives as his monthly distributive share of net profits however is not related in any direct manner to the fees that he has actually earned himself during that period of time. Illustratively, for the month of February, 1969, one of the member pilots, a Captain Columbo, earned *gross* pilotage fees of only $1,245.69, whereas his *net* distributive share of the earnings of all of the pilots during that period was $1,255.79 or $10.10 more than Captain Columbo personally earned, gross, in pilotage fees.

### 9.

All of the financial arrangements heretofore mentioned are entirely private and voluntary; only the *amount* of pilotage fees is fixed by statute. All of these other matters and details exist by reason of the private contractual undertakings of the pilots with one another in the form of their general rules and customs. Likewise, the pilots' working

rules and schedules are matters of their private and mutual consent; competition between them being prohibited by their own general rules, not by law. By their mutual consent they require one another to work on a "first on the slate, next on the ship" basis. Further, and again by their mutual consent, if additional capital is required for the acquisition of common property, each pilot is obliged to put up his "by heads" share of the capital requirements.

## 10.

It is also to be noted that the pilots collectively do not restrict their activities or business to the piloting of vessels which by state law are required to carry a Crescent River Port Pilot aboard. They admittedly engaged in "private" as contra-distinguished from "statutory" pilotage and the fees thus earned are handled in the identical manner as fees earned for "statutory" pilotage.

## CONCLUSIONS OF LAW

### 1.

The law respecting partnerships in Louisiana is clearly set forth in the Revised Civil Code of 1870. Article 2801 of the Code provides that a:

"Partnership is a synallagmatic and commutative contract made between two or more persons for the mutual participation and the profits which may accrue from property credit, skill or industry, furnished in determined proportions by the parties."

### 2.

It is clear that the pilots, collectively, by and through their general rules and customs have consented voluntarily and privately to work and operate in a given manner and to share in the fruits of one another's skill, expertise and industry. They contribute equally to their common assets and share the profits of their common skill and labor on the "days worked" formula heretofore described. That they have agreed to the mutual participation in profits accruing from their skill and industry in determined proportions is clear. It is also clear that each of the pilots contemplates that a profit will be made in which each will participate in accordance with their mutual agreement or stipulation as required by Article 2811 of the Louisiana Revised Civil Code of 1870.

### 3.

That there are no specific written "articles of partnership" so denominated or that the pilots have not said individually or collectively nor formally written that "we declare that we are partners" would not and does not prevent their relationship from being one of legal partnership under Louisiana law and a legal entity separate and apart from the corporate entity denominated the "Crescent River Port Pilots Association" which conducts the internal management and administration of the partnership. Robertson v. De Lizardi, 4 Rob. 300 (La.1843); Pelican Plumbing Supply, Inc. v. Dixie Plumbing and Heating, (La.App., 4 Cir., 1969) 225 So.2d 239; Posey v. Fargo, 187 La. 122, 174 So. 175 (1937); and City of New Orleans v. Gauthreaux, 32 La.Ann. 1126 (1880). Indeed, a Louisiana partnership may exist by operation of law alone and even though the parties expressly disclaim an intention to form or create a partnership. As stated by the Louisiana Supreme Court in the case of Cooley v. Broad, 29 La.Ann. 345 (1877):

"The only reason for doubting the existence of the partnership arises from the express declaration of the parties that no partnership was created by the act of association. They certainly did enter into an association, furnishing thereto specified capital, agreeing to divide profits and losses in fixed proportions, and engaging to carry freights and passengers for hire.";

"When there exist all the conditions which, by law, create a legal relation, the effects flowing legally from such relation will follow, whether the par-

ties foresaw and intended them or not.";

"The fact that the parties had made stipulations between themselves as to their liability for each others' debts, or as to the proportion of their several responsibilities, can not affect third persons, even had these stipulations been within the knowledge of such third persons." 345 at 346–357.

**4.**

■ On the basis of the facts presented herein and it is therefore concluded that the individual pilots were, as to one another, "ordinary" partners and that collectively they were, in law, an "ordinary partnership" within the meaning of Articles 2824, 2825 and 2826 of the Louisiana Revised Civil Code of 1870.

**5.**

■ Article 2873 of the Louisiana Revised Civil Code of 1870 relating to the liabilities of "ordinary" partners provides that:

"In the ordinary partnership, each partner is bound for his share of the partnership debt, calculating such share in proportion to the number of the partners, without any attention to the proportion of the stock or profits each is entitled to."

This per capita responsibility includes delictual as well as contractual obligations irrespective of whether the partners have knowledge or control of the wrongful act, provided the tort was committed by one of their number "in the course of the partnership business". Champagne v. Southern Farm Bureau Casualty Ins. Co. (La.App. 4 Cir., 1964), 170 So.2d 226; Independence Indemnity Co. v. Carmical & Woodring (La.App. 2 Cir., 1930), 13 La.App. 64, 127 So. 10; Haddad v. Endom's Transfer & Storage Garage (La.App. 2 Cir., 1933), 150 So. 870.

**6.**

■ There is little doubt that the "Partnership business" of these individuals is the piloting of vessels, nor can there be any doubt that the alleged negligence of their fellow partner, Pilot Scarbrough, occurred "in the course of" that business. Therefore, under Louisiana law, each partner would be liable for his virile share of the negligently inflicted damages in this case. And this liability of the partners is not affected because the death of Pilot Scarbrough caused an *instanter* dissolution of the partnership. Louisiana Revised Civil Code of 1870, Articles 2876(3), 2881 and 2873. Johnson v. Iowa Rice Dryer, Inc. (La.App. 3 Cir., 1969), 226 So.2d 194.

**7.**

■ Notwithstanding the foregoing findings and conclusions, the Court considers itself bound by the decision in Guy v. Donald, 203 U.S. 399, 27 S.Ct. 63, 51 L.Ed. 245 (1906) as interpreted by Dampskibsselskabet Atlanta A/S et al. v. United States (CCA 5, 1929), 31 F.2d 961, judicially creating a doctrine of immunity for pilot associations and individual pilots, whether or not the nature of their association be characterized a corporation or a partnership.

**8.**

For the foregoing reasons, the motions for summary judgment were heretofore granted. Further, being of the opinion that there is no just reason for delay, the Clerk, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure is directed to enter judgment forthwith dismissing the actions filed against the Crescent River Port Pilots Association and each of the individual pilots.