# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 10, 2007　　　　　Decided May 15, 2007

No. 05-5382

RICHARD J. MENKES,
APPELLANT

v.

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 04cv01456)

*Jonathan G. Axelrod* argued the cause for appellant. On the briefs were *Edward M. Gleason, Jr.* and *Richard W. Gibson*.

*Megan L. Rose*, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Michael J. Ryan*, Assistant U.S. Attorney, entered an appearance.

Before: SENTELLE and BROWN, *Circuit Judges,* and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*:  Richard J. Menkes, a ship pilot who sued the Coast Guard, appeals from the district court's decision holding that the court lacked jurisdiction over his APA claim and that his constitutional claims failed to state a cause of action.  We reverse and direct a remand to the agency.

I

Appellant is a licensed pilot registered by the Coast Guard under the Great Lakes Pilotage Act of 1960.  46 U.S.C. §§ 9301 *et seq*.  This case has its origin in a dispute between Menkes and the St. Lawrence Seaway Pilots' Association, a private business organization composed of ship pilots who provide pilotage service on the waters of the Great Lakes.

The Great Lakes Pilotage Act generally requires that U.S. or Canadian registered pilots navigate certain types of vessels through designated waters of the Great Lakes.  Pursuant to the Act, the President of the United States has designated three areas in the Great Lakes where navigation by a registered pilot is required:  District One, District Two, and District Three.  To facilitate efficient pilotage in these designated areas, the Act permits the Coast Guard to establish "pilotage pools," which are to be formed by "voluntary" associations of U.S. registered

pilots.[1]  The Coast Guard authorized the Association to form such a pool in District One.

Menkes was a member of the Association and its pilotage pool until he quit the Association in December 2000 due to unexplained professional differences and mounting personal animosity between Menkes and other members of the Association.  Previously, Menkes had written to Frank J. Flyntz, the Coast Guard's Director of Great Lakes Pilotage, to inform him that he (Menkes) intended to quit the Association, but that he wanted to continue service as a registered pilot in District One and that he "maintain[ed] [his] right to be dispatched."[2]

---

[1]The relevant section reads in full:

> (a) The Secretary may authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services.

> (b) For pilotage pools, the Secretary may—

> (1) limit the number of the pools; (2) prescribe regulations for their operation and administration; (3) prescribe a uniform system of accounts; (4) perform audits and inspections; and (5) require coordination on a reciprocal basis with similar pool arrangements authorized by the appropriate agency of Canada.

46 U.S.C. § 9304.

[2]In September 1998, over two years before leaving the Association, Menkes applied to form a second pilotage pool in District One—i.e., in addition to the Association—consisting solely of himself. Menkes's application was denied in June 2000.  Flyntz's letter informed Menkes that the controlling statute and regulations required that pilotage pools have more than one member.  In addition, Flyntz noted the forty-year history of the Great Lakes Pilotage Act, in which

Flyntz responded, telling Menkes that his resignation from the Association "has no effect on your status as a Registered Pilot," and "[t]herefore you will be placed on the St. Lawrence River tour-de-role [i.e., pilotage assignment system] at the beginning of the [2001 navigation] season." Flyntz also noted that he expected Menkes would continue to use the Association's infrastructure and equipment, and that in accordance with Coast Guard regulations, *see* 46 C.F.R. § 401.340(a)-(c), Menkes would execute a written authorization allowing the Association to bill Menkes for services and require his compliance with the Association's rules and procedures.

In March of the following year, Flyntz wrote to the Association President, Roger Paulus, in response to Paulus's letter concerning Menkes's status for the 2001 navigation season. Flyntz stated that "Captain Menkes will continue to serve as a pilot on the St. Lawrence River tour-de-role," and that he would "be available for dispatch whether or not he belongs to a pilotage pool." He pointed out that "[a] pilotage pool is a *voluntary* association of registered pilots," (citing 46 U.S.C. § 9304 (emphasis in original)), and that "[t]here is no mandatory requirement in statute or regulation that requires Great Lakes registered pilots to belong to a pool in order to provide pilotage service." Flyntz further noted that Menkes's "resignation from the Association does not . . . provide any basis for the Coast Guard *to deny him the opportunity to continue to earn his livelihood as a U.S. registered pilot*," (emphasis added) and that Menkes had "*a vested property right in his certificate of registration*" (emphasis added) that the Coast Guard could not revoke merely because Menkes "does not belong to a pilotage pool." Flyntz went on to say: "Furthermore, . . . there is a

---

the Coast Guard had authorized only one pool for each of the three pilotage districts. According to Flyntz, Menkes had failed to show that a second pilotage pool was necessary in District One.

serious need for qualified pilots in District 1 and . . . the Association has not physically provided adequate pilotage service in accordance with 46 C.F.R. § 401.720(b)."[3] That section of the Coast Guard regulations permits the Director of Great Lakes Pilotage to order a registered pilot to provide pilotage service whenever an association cannot provide service due to "physical or economic inability." Then, invoking his authority under Coast Guard regulations, including § 401.720, Flyntz announced his decision to dispatch Menkes as "an independent pilot" in District One. The Association appealed Director Flyntz's decision to J.P. High, the Coast Guard's Director of Waterways Management, who denied the appeal.

Thereafter, Paul M. Wasserman became Acting Director (and subsequently Director) of Great Lakes Pilotage, and he apparently had a somewhat different view. On December 29, 2003, Wasserman, responding to another Association enquiry concerning Menkes's status as an independent pilot in District One, wrote to both Paulus and Menkes. Wasserman rejected the Association's argument that a "change in circumstances" warranted a reversal of Flyntz's 2001 decision to place Menkes on the tour-de-role, noting that the Association was still not providing adequate pilotage service. Wasserman affirmed Flyntz's determination from 2001 and renewed that determination for the 2003 navigation season. But he wrote that

---

[3]Section 401.720(b) reads in full:

> (b) When pilotage service is not provided by the association authorized under [the Act] because of a physical or economic inability to do so, or when the Certificate of Authorization is under suspension or revocation under § 401.335, the Director may order any U.S. registered pilot to provide pilotage service.

46 C.F.R. § 401.720(b).

at the "end of the season, . . . my determination, and Captain Menkes' appointment as an independent pilot, will naturally expire." This statement is the first indication from the Coast Guard that Menkes's status as an independent pilot was on a season-to-season basis. Wasserman added that he would continue to evaluate the Association's pilotage service in order to determine whether independent pilots were needed for the 2004 navigation season.

Then, in January 2004, Wasserman responded to appellant's further letters, stating:

> Your letters imply that your status as an independent pilot in District One is a permanent circumstance. . . . [Y]ou were appointed as an independent pilot on March 7, 2001, because [Director Flyntz] found that the Association was not able to provide adequate pilotage service at that time. . . . Your status as an independent pilot has been predicated on a determination by my office that an extraordinary circumstance exists, which I have not made for any future navigation seasons. Therefore, it would be inappropriate for you to consider your status as an independent pilot in District One to be a permanent circumstance.

The Coast Guard, at that point, appears to have set forth two modifications to its policy. Wasserman wrote (1) that Menkes's appointment expired on an annual basis and (2) that any new appointment would depend on the Director's determination, not just that the Association has a "physical or economic inability" to provide service, but also that "extraordinary circumstances" exist necessitating the appointment of an independent pilot, which seems to be a stricter standard.

Menkes appealed Wasserman's decision to Assistant Commandant T. H. Gilmour. Gilmour denied the appeal, essentially reiterating Wasserman's position. Gilmour noted, however—rather suggestively—that "Captain Menkes is free to apply to the SLSPA for membership in that association. He is also free to apply to other pilotage associations within the Great Lakes since he will have a valid license and a valid certificate of registration as a U.S. registered pilot on the Great Lakes." The letter concluded by noting that the denial of Menkes's appeal "constitutes final agency action."

Menkes filed suit in federal district court in August 2004 seeking, *inter alia*, reinstatement of his status as an independent pilot and an order prohibiting defendants from requiring Menkes "to become a member of the Association as a condition of working." Menkes's complaint lists three claims—that the Coast Guard's action (1) violated his associational rights under the First Amendment; (2) violated his Fifth Amendment right to due process; and (3) was in violation of the APA. The district court granted defendants' motion to dismiss. *See Menkes v. Dep't of Homeland Sec.*, 402 F. Supp. 2d 204, 210 (D.D.C. 2005).

The court addressed each of Menkes's three claims in turn, beginning with the APA challenge. Although recognizing that there is a strong presumption of reviewability under the APA, the court explained that APA review is not available if agency action is "committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2). A matter is committed to agency discretion when there is a lack of judicially manageable standards to guide meaningful review. *Steenholdt v. F.A.A.*, 314 F.3d 633, 638 (D.C. Cir. 2003). The court reasoned that the regulations, by specifically giving the Director sole authority to make determinations about the need for non-association pilots, failed to provide a judicially manageable standard by which to review

such a decision. Thus, whether additional pilots were required—or, alternatively, whether the Association was providing adequate pilotage service—were questions within the unreviewable discretion of the agency.

The district court also disposed of Menkes's constitutional claims. With respect to Menkes's First Amendment association claim, the court concluded that "defendants do not *require* the plaintiff to join the [Association] as a condition to employment," 402 F. Supp. 2d at 209-10, noting that the Coast Guard had allowed Menkes to serve as a pilot from 2001 to 2003 without joining the Association. Because the only "prerequisite" to Menkes's employment was a determination by the Director that the Association was not providing sufficient service, the court decided that Menkes had failed to state a valid First Amendment claim.

Turning to Menkes's Fifth Amendment due process claim, the court observed that a constitutionally protected property interest in continued employment only arises when a plaintiff can demonstrate a legitimate claim of entitlement to the benefit in question, rather than a mere unilateral expectation, abstract need, or desire to have the benefit. *Id.* at 210 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972)). Here Menkes had no legitimate claim of entitlement because "the pertinent *statutes* themselves do not expressly create an entitlement to the authorization of working as an independent pilot in a district with an approved pilotage pool." *Id.* (emphasis added). The court noted that the Great Lakes Pilotage Act and the Coast Guard's interpretation of the Act "caution against any reliance upon working as an independent pilot by reiterating that the Director must first determine that 'extraordinary circumstances' exist rendering independent pilots necessary." *Id.* Thus, according to the court, the Act does not secure any benefit for

Menkes and does not support any claim of entitlement to continued status as an independent pilot.

## II

Appellant's APA argument—that the Coast Guard's actions are arbitrary and capricious and contrary to law—is based first on the claim that the Coast Guard, without explanation, changed its position by announcing that his appointment was on an annual basis only. Wasserman's position is, according to appellant, in tension with Flyntz's earlier statement that Menkes had "a vested property right in his certificate of registration" and that resignation from the Association did not "provide any basis for the Coast Guard to deny [Menkes] the opportunity to earn his livelihood as a U.S. registered pilot." Appellant further claims that the Coast Guard is rather obviously, if implicitly, attempting to compel him to rejoin the Association in order to gain work. That, too, is an unexplained change in position and, according to appellant, is in conflict with the statute which explicitly describes pools as "voluntary" associations.

Relying on his contention that the Coast Guard is seeking to compel him to rejoin the Association, appellant contends that the agency's behavior not only violates the governing statute, but it also violates his First Amendment right not to be forced to join an expressive association as a condition of employment with the government. (Although appellant asserts that the Association takes part in various lobbying activities, he does not indicate that he objects to any particular position of the Association.) Finally, appellant argues that the Coast Guard has violated his Fifth Amendment right to due process because the agency has deprived him of a property interest—the right to engage in piloting pursuant to his acknowledged property

interest in his registration—without any hearing, or, indeed, without anything but a conclusory explanation.[4]

In response, the government raises a number of threshold jurisdictional arguments. Frankly, we do not think them worth a tinker's damn. First, it is claimed that since appellant only challenged the Coast Guard's determination of his status for the 2004 season, which has long since concluded, there is no longer a case or controversy for us to decide; the case is thus moot because Menkes never requested assignment for subsequent navigation seasons. That argument improperly assumes that the Coast Guard is correct on a disputed issue—whether appellant's appointment had to be renewed annually. In any event, appellant claims that the Coast Guard's 2004 letter, reasonably interpreted, indicated that he would not receive assignments in future seasons unless he rejoined the Association. Therefore, under his theory, further requests for work in 2005 and 2006 would have been futile.

Secondly, the government challenges our jurisdiction on the ground that the 2003-2004 letters from Wasserman and Gilmour were not "final agency action," *see* 5 U.S.C. § 704; rather, the letters simply informed Menkes of the pre-existing fact that his appointment would expire at the end of the 2003 navigation season. This argument would be unworthy of the government—the letters reflected a changed position and quite clearly constituted a final informal adjudication—even if

---

[4]In addition, appellant raises a substantive due process claim. We consider this argument insubstantial. The Coast Guard's actions, even if mistaken, do not amount to a "conscience shocking" abuse of executive power that violates the substantive component of the Due Process Clause. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998).

Gilmore had not explicitly said, "[t]his denial of your appeal constitutes final agency action."

Finally, we turn to the argument that persuaded the district court—that the Coast Guard's action is unreviewable because, under section 701(a)(2) of the APA, the Director's decisions in the case are "committed to agency discretion by law." As we noted, the district court thought it had no manageable standards to allow it to review the Director's decision not to order an independent pilot to provide service pursuant to section 401.720(b) of the Coast Guard regulations. In other words, the court apparently considered the Association's "physical or economic" ability to provide adequate pilotage service an unbounded policy question. We disagree.

In the first place, appellant raises an anterior legal claim. He argues that if the Coast Guard regulations are read to give a preference to members of the Association, rather than treating non-members who comply with the pool's working rules equally with members, *see* 46 C.F.R. § 401.340, the regulations would then conflict with the controlling statute, which only allows for pool formation by "voluntary" associations. It can hardly be suggested that this legal question is not susceptible to judicial review.

Moreover, even if the Coast Guard is entitled to prefer the Association over non-member pilots when there is limited demand, a court could still review the Director's determination with respect to the adequacy of the service provided by the pool—i.e., whether the pool has the *physical* and *economic* ability to provide sufficient service. *Center for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988) (per curiam) (noting that agency regulations may provide "law to apply"). We have often held that standards similar to that set forth in section 401.720(b) are reviewable. *See, e.g.*, *Dickson v. Sec'y of*

*Defense*, 68 F.3d 1396, 1401-03 (D.C. Cir. 1995) (reviewing decision of military review board where board "may excuse failure to file" if in the "interest of justice"); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1223-25 (D.C. Cir. 1993) (allowing review of agency decision to provide exceptions "as the Secretary deems appropriate" because statutory scheme provided sufficient standards to guide review). To be sure, the Director might be entitled to a good deal of deference in determining whether the pool was physically or economically able to provide adequate service, but that does not mean the Director could make such decisions unreasonably. For example, it would be presumably arbitrary and capricious for the Coast Guard to ignore an obvious unfilled demand for pilotage service, or to change its standards for determining what level of service is adequate without explanation. Also dubious would be a refusal to appoint a pilot for reasons not mentioned in the regulations, such as an effort to force the pilot to join the Association.

## III

It is not appropriate for us to decide appellant's statutory argument—that giving a preference to the Association conflicts with the controlling statute's use of "voluntary association"—at this time. We cannot pass comfortably on that question because we do not have a forthright agency interpretation of the statute. Paradoxically, the government argues that we should give deference to its interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). But putting aside the question raised by *United States v. Mead Corp.*, 533 U.S. 218 (2001)—whether an interpretation advanced only in an informal adjudication is entitled to deference—in this case we do not have an explicit agency interpretation of either the statute or the regulation to evaluate. To be sure, section 401.720(b) could be read to imply a

preference for the Association. The Wasserman and Gilmour letters could also be read to suggest as much.[5] But an implication is not an agency interpretation, and we are disinclined to tease out, from the welter of correspondence in this case, an interpretation the agency itself has failed to offer. The statutory question is potentially a difficult one. The Coast Guard must come to grips with the meaning of the statute, and, particularly, the meaning of the term "voluntary association." An agency interpretation is not only necessary to meet appellant's administrative law challenge, it is also essential, as we will explain, to meet his constitutional claims.

Even assuming that the Act can be interpreted to allow the Coast Guard to give a preference to pool members so long as the Association has the physical and economic ability to meet demand, the record is silent on whether that was so when appellant was denied an appointment in 2004. Of course, this was an informal adjudication, and it is common for the record to be spare in such cases. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 139-41 (1973). But here we have no indication that in 2004 the situation had changed from earlier years when the pool could not provide adequate service. Moreover, Director Wasserman's use of "extraordinary circumstances," as we have noted, seems to be an unexplained, stricter threshold for the appointment of non-member pilots than the regulation's text contemplates. Thus, if the pool could not meet demand, and the Coast Guard was simply seeking to compel Menkes to join the Association, that decision might be thought in contravention of the Coast Guard's own regulations. In any event, the Coast Guard has offered no

---

[5]In addition, the large price of Association membership, $60,000, might suggest that members expect at least a preference in assignment; on the other hand, the membership stake could reflect only an equity interest in boats and equipment. The record does not tell us which is the case.

explanation regarding the changed conditions from the 2003 to 2004 navigation season, and on remand it will be obliged to do so.[6]

The district judge dismissed appellant's constitutional contentions for failure to state a claim. We think that was at least premature. Menkes's First Amendment claim depends on the assumption that the Coast Guard was attempting to force him to join the Association as a condition of employment. As we understand his position, even granting a preference to pool members would constitute such compulsion. Although he never indicates what expressive conduct by the Association he finds objectionable, he does argue that forcing him to join the Association is a First Amendment violation. For this point, he relies primarily on *Abood v. Detroit Board of Education*, 431 U.S. 209, 234-35 (1977). *Abood* stands for the proposition that the government may not compel an employee to subsidize the political (i.e., non-representational) speech of his or her labor union—although, under previous Supreme Court case law, compulsory union membership is permitted as a condition of employment. Appellant seeks to extend the *Abood* principle to his situation by arguing that the government cannot force him to join an expressive, private organization as a condition of employment with the government. Before grappling with this First Amendment issue, however, we would like to see how the Coast Guard responds to our remand order on appellant's APA claim. Conceivably, this question will be mooted.[7]

---

[6]If the Coast Guard's view of adequacy of supply changed in 2004, an explanation would have to include specific comparisons.

[7]Appellant's prayer for relief asks, *inter alia*, that he be "ma[d]e whole" for his lost employment opportunities, but it is unclear on what basis he seeks such a remedy.

Finally, appellant's Fifth Amendment due process claim raises quite troublesome issues. It rests on the proposition that Menkes had a property interest in his Coast Guard registration, and also in his appointment as an independent pilot. The district court, as we observed, rejected that notion out of hand, asserting that the Act did not confer such an interest. But the Supreme Court has recognized that a property interest in employment can be created through informal understandings between an institution and its employee. *Perry v. Sinderman*, 408 U.S. 593, 600-03 (1972). By analogy, it might be thought that appellant's registration as a pilot carried an entitlement to certain appointments. After all, Director Flyntz's March 2001 letter explicitly referred to Menkes's "property right in his registration certificate" and suggested that right gave him "an opportunity to continue to earn his livelihood." And Flyntz never suggested that Menkes's appointment was year-to-year.[8]

Whether appellant had an entitlement to a pro rata share of all pilotage assignments—or even such assignments as the pool could not adequately meet—would depend on the nature of the understandings reached between the Coast Guard and the pilots. And if it were shown that appellant had a property interest in such assignments as the pilotage pool could not meet, then he would be entitled, under the Fifth Amendment, to a further hearing to determine whether conditions constituting adequate pilotage service *actually* existed. Again, this issue might well be moot after remand, but we should note that if appellant succeeded in establishing a constitutionally protected interest in property, he would have an opportunity to challenge factual

[8]Wasserman may have been attempting to unilaterally convert a *Sinderman* case to a *Roth* case—i.e., from one in which there is an understanding of permanent employment status to one in which the employee has only a year-to-year expectancy.

determinations not normally present in deferential APA review of informal adjudications.

## IV

For the foregoing reasons, the judgment of the district court is reversed and the decision of the Coast Guard is vacated. We remand this matter to the district court with instructions to remand the APA claim to the Coast Guard for further proceedings consistent with this opinion. The district court should retain jurisdiction over appellant's constitutional claims, but hold them in abeyance pending the Coast Guard's response to the remand.