BROWN, Circuit Judge,
dissenting in part:
This is not an easy case. The court recognized as much before our initial remand, acknowledging “[t]he statutory question is potentially a difficult one,” and *343 urging the Coast Guard to provide a “forthright agency interpretation.” Menkes v. Dep’t of Homeland Sec. (“Menkes II”), 486 F.3d 1307, 1313-14 (D.C.Cir.2007). The Coast Guard did not heed our advice. The process the Coast Guard instituted on remand, as well as the agency’s proffered interpretation of the relevant statute and/or its own regulations still provides little light for those lost at sea.
Neither the Coast Guard’s Agency Decision on Remand nor the court’s opinion identifies precisely what is being interpreted: the statute, the Great Lakes Pilotage Act (“GLPA”), or the agency regulations. The Agency Decision on Remand focuses on the Coast Guard’s regulations, 46 C.F.R. §§ 401.320 and 401.340. But at the same time, the Agency Decision on Remand purports to define the term “voluntary association” — a phrase that appears only in the statute. The court’s opinion, by comparison, suggests the question is one of “statutory interpretation” and that “we are constrained to address ... the Coast Guard’s construction and application of the statute.” Maj. Op. 330. Yet the court focuses on the Coast Guard’s regulations and their animating policies — not the statute — when justifying the deference it gives and the reasonableness of the agency’s “statutory” construction. Maj. Op. 331, 332.
Different interpretive processes implicate different levels of deference, and ultimately this case is about deference— whether it is owed, and if so, how it would be applied. Whether the Coast Guard is interpreting the statute or its own regulations, however, its interpretation stems from an informal adjudication. As a result, the path to deference is not as simple as the court makes it seem. If this is an agency regulation case, our precedent requires notice and comment when modifying an interpretation of an agency regulation — a process the Coast Guard did not institute on remand. If this is a statutory interpretation case, the minimum safeguards required by the Administrative Procedures Act (“APA”) are necessary— procedures the Coast Guard also did not implement on remand. Either way, the agency is not entitled to the reflexive and uncritical sort of deference the court gives here.
At bottom, the Coast Guard argues allowing the SLSPA to compel membership and screen pilots before dispatching them to work on the Great Lakes is consistent with the term “voluntary.” Even assuming deference is owed, this statutory gloss — framed as an interpretation of the agency’s own regulations or as an interpretation of the statute itself — seems both dubious and pernicious. Therefore, I dissent.[1]
I
Although an agency is “entitled to significant deference in interpreting its own regulation — perhaps even more than an agency gets in interpreting a statute under Chevron ” — it is unlikely we would defer to an unreasonable agency interpretation of an ambiguous regulation. Kidd Commc’ns v. FCC, 427 F.3d 1, 4 (D.C.Cir.2005); see Paralyzed Veterans of Am. v. D.C. Arena, L.P., 117 F.3d 579, 584 (D.C.Cir.1997) (citing Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)); see also Harry T. Edwards & Linda A. Elliott, Federal Courts Standards of Review: Appellate Court Review of District Court Decisions and Agency Actions 165 (2007). An agency may tweak its interpretation either through general rulemaking or by adjudication. See SEC v. Chenery Corp., 332 *344 U.S. 194, 202-03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). But, once an agency gives its regulation a definitive interpretation, “ ‘it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking.’ ” Alaska Prof'l Hunters Ass’n v. FAA, 177 F.3d 1030, 1034 (D.C.Cir.1999) (quoting Paralyzed Veterans, 117 F.3d at 586). An agency has less flexibility in “changing its interpretation of its regulations than in altering its construction of a statute” because the APA defines “rulemaking” to include “not only the agency’s process of formulating a rule, but also the agency’s process of modifying a rule.” Id. (citing 5 U.S.C. § 551(5)).
The Coast Guard’s first interpretive effort was put forward by Director Flyntz in the 2001 informal adjudication that set the present controversy in motion. See Chenery, 332 U.S. at 202, 67 S.Ct. 1575 (stating an agency may promulgate regulatory “rules” by “individual order,” i.e. in an informal adjudication). We summarized Mr. Flyntz’ position in Menkes II: “Flyntz stated that ‘Captain Menkes will continue to serve as a pilot on the St. Lawrence River tour-de-role,’ and that he would ‘be available for dispatch whether or not he belongs to a pilotage pool.’ ” 486 F.3d at 1309 (quoting Letter from F.J. Flyntz, Director, Great Lakes Pilotage to Roger Paulus, President, SLSPA at 1 (Mar. 7, 2001) [hereinafter Flyntz March Letter], reprinted in J.A. 131). Flyntz emphasized that “ ‘[a] pilotage pool is a voluntary association of registered pilots,’ (citing 46 U.S.C. § 9304), and that ‘[t]here is no mandatory requirement in statute or regulation that requires Great Lakes registered pilots to belong to a pool in order to provide pilotage service.’ ” Id. (alterations in original). Flyntz specifically noted: “resignation from the Association does not ... provide any basis for the Coast Guard to deny him the opportunity to continue to earn his livelihood as a U.S. registered pilot.” Id. (alteration in original).[2]
Yet in 2003, Paul Wasserman, the newly appointed Director, presented a different view. See Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Roger Paulus & Richard Menkes at 2 (Dec. 29, 2003) [hereinafter Wasserman December Letter], reprinted in J.A. 76. Mr. Wasserman (and Commandant Gilmour who affirmed Wasserman’s informal adjudication when the SLSPA challenged it) read § 401.720(b) as creating a preference for the Association so long as the Association has the physical and economic ability to meet demand. Id. Further, Gilmour noted in 2004 that “Captain Menkes is free to apply to the [Association] for membership in that association. He is also free to apply to other pilotage associations within the Great Lakes since he will have a valid license and a valid certificate of registration as a U.S. registered pilot on the Great Lakes.” Letter from T.H. Gilmour, Real Admiral, U.S. Coast Guard to Edward M. Gleason, Beins, Axelrod, Kraft, Gleason & Gibson, P.C. at 2 (Apr. 2004) [hereinafter Gilmour April Letter], reprinted in J.A. 68. In other words, Menkes would have to apply to the Associ *345 ation to “continue to earn his livelihood as a U.S. registered pilot.” Flyntz March Letter, supra page 3.
On remand, the Coast Guard “view[ed] Mr. Menkes’s challenge to be a matter that is governed entirely by 46 C.F.R. § 401.720(b).” Agency Decision on Remand at 7, J.A. 285. In so doing, the agency specifically disavowed Mr. Flyntz’ regulatory interpretation, arguing it was “never an authoritative statement,” but rather, “an aberration.” Id. at 10-11, J.A. 288-89 (finding Flyntz’s statements “more consistent with exercising the authority granted in 46 C.F.R. § 401.720(b) than it is with an interpretation of 46 U.S.C. § 9304”). The Agency Decision on Remand thus adopted Mr. Wasserman’s interpretation. But this leaves the Coast Guard with a problem the court’s opinion never acknowledges: there have been two informal adjudications interpreting the agency’s regulations, and they are contradictory.
If Wasserman’s interpretation of the Coast Guard regulations is definitive, so is Flyntz’s. Both men held the same position in the agency — Director of the St. Lawrence Seaway District. And, both made a decision about the same controversy— Captain Menkes’s ability to work as an independent pñot. The fact that the Agency Decision on Remand validated Wasserman’s view does not resolve the underlying contradiction. Nor does it transform Wasserman’s interpretation into one of greater authoritative worth than Flyntz’s. Under this court’s precedents, a definitive interpretation can only be changed through rulemaking. See Paralyzed Veterans, 117 F.3d at 586; Edwards & Elliott, supra page 2. Furthermore, even had the Coast Guard followed appropriate procedures, deference will not save a regulatory interpretation that is plainly erroneous or inconsistent with the agency’s enabling statute. See Paralyzed Veterans, 117 F.3d at 584 (“It is certainly not open to an agency to promulgate mush and then give it concrete form only through subsequent less formal ‘interpretations.’ ”); Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (stating regulations cannot be “manifestly contrary” to their enabling statute); see also Edwards & Elliott, supra page 2, at 163 (citing Stinson v. United States, 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993)). If, as seems likely, the Coast Guard actually means to interpret the statute, there are other problems.
II
“Not every agency interpretation of a statute is appropriately analyzed under Chevron.” Ala. Educ. Ass’n v. Chao, 455 F.3d 386, 392 (D.C.Cir.2006) (Ginsburg, J.) Chevron deference is afforded those interpretations having the “force of law.” United States v. Mead Corp., 533 U.S. 218, 229-30, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). It does not apply to an agency’s litigation position, which provides a post hoc rationalization. See Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); Landmark Legal Found, v. IRS, 267 F.3d 1132, 1135-36 (D.C.Cir.2001). Nor does Chevron govern an agency declaration unaccompanied by those procedural safeguards ensuring proper administrative practice. See Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 754 (D.C.Cir. 2007) (citing Mead, 533 U.S. at 235, 121 S.Ct. 2164; Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)); see also Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (“[Ijnterpretations contained in policy statements ... which lack the force of law ... do not warrant Chevron-style deference.”); NLRB v. United Food & Commercial Workers Un *346 ion Local 23, 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (finding Chevron deference appropriate when regulations are “promulgated pursuant to congressional authority”). “Otherwise the Administrative Procedure Act, which specifies how delegated power is to be exercised, would be a dead letter.” Krzalic v. Republic Title Co., 314 F.3d 875, 882 (7th Cir.2002) (Easterbrook, J., concurring).
In Menkes II, the Coast Guard “did not have a forthright agency interpretation of the statute.” Menkes II, 486 F.3d at 1313. In fact, the Flyntz and Wasserman letters presented contradictory positions. As a result of this disparity, the Menkes II court instructed the Coast Guard to “come to grips with the meaning of the statute, and particularly, the meaning of the term ‘voluntary association.’ ” Menkes II, 486 F.3d at 1314.
Assuming the Agency Decision on Remand represents the Coast Guard’s definitive interpretation of the GLPA, the hallmarks of “fair and considered” judgment are absent. As previously noted, the Coast Guard did not conduct notice-and-comment rulemaking before promulgating its Agency Decision on Remand. Nor did the Agency reach its interpretive conclusion after formal adjudication. The procedures the agency employed on remand did not even meet the minimum procedural requirements contemplated for “informal adjudication” in the APA, such as the consideration of “evidence contradicting [the agency’s] position.” See Butte County, Cal. v. Hogen, 613 F.3d 190, 194-196 (D.C.Cir.2010) (discussing, in part, procedural safeguards set up by § 706 review); Safe Extensions, Inc. v. FAA, 509 F.3d 593, 604 (D.C.Cir.2007) (stating informal adjudication may consist of evidence outside the administrative record).
The agency controlled the process and the record on remand. After initially inviting Menkes to submit additional documents, see Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Jonathan Axelrod at 1 (Sep. 20, 2007) [hereinafter Wasserman September Letter], reprinted in J.A. 333, the agency expressed concerns with Menkes’s submissions, noting they contained unauthorized employee affidavits and interposing claims of privilege that were never subjected to court review, see Letter from Paul M. Wasserman, Director, Great Lakes Pilot-age to Jonathan Axelrod at 1-2 (Oct. 18, 2007) [hereinafter Wasserman October Letter], reprinted in J.A. 421; see also Agency Decision on Remand at 35-37, J.A. 313-315. The agency said it would not consider evidence “improperly provided,” not “relevant or necessary for the Coast Guard’s decision.” Wasserman October Letter, supra page 7, or outside the administrative record, Wasserman September Letter, supra page 7. But when the Coast Guard finally released the Agency Decision on Remand, it relied heavily on information outside the administrative record, notably a self-serving declaration by Paul M. Wasserman and informal communications between Wasserman and the SLSPA. Agency Decision on Remand at 3, J.A. 281. Pertinent here, the agency excluded evidence suggesting the agency began setting its policies only after conferring with SLSPA lawyers in a deliberate attempt to better accommodate the Association. See Lawler Aff. ¶ 5, reprinted in J.A. 349; Flyntz Aff. ¶ 9g, reprinted in J.A. 412 (suggesting political and lobbying pressure changed Coast Guard procedures and personnel). More than contradict certain statements in Wasserman’s affidavit, Menkes’s excluded evidence suggests his ouster was a predetermined act intended to curry favor with the Association, not the byproduct of a fair consideration of competing arguments. According to the agency, Menkes’s proffered evidence was simply irrelevant. Agency Decision on *347 Remand 36, J.A. 314. But determining relevancy ab initio is an all but impossible task unless the desired end is certain.
I do not mean to suggest our remand order transformed any subsequent interpretation by the Coast Guard into a ruling without the “force of law.” To the contrary, the Coast Guard had every opportunity to proceed in a fair and considered manner, following the APA’s procedural requirements for delegated agency action. The agency simply chose not to do so.
Unlike agency positions taken as a result of more structured adjudicatory proceedings, whether formal or informal in nature, nothing binds the Coast Guard to its current interpretation of the GLPA. The Agency Decision on Remand is not published or readily available to the public — a factor distinguishing the Coast Guard’s decision from a virtual laundry-list of other agencies.[3] As a result, the Agency Decision on Remand does not provide traditional rule-of-law values: it is not publically knowable; it lacks any assurances of stability; and litigants cannot rely upon it when challenging contrary agency action in the future. See Sprint Corp. v. FCC, 315 F.3d 369, 373 (D.C.Cir.2003) (describing informal adjudication as “ ‘lack[ing] the firmness of a [prescribed] standard,’ ” not “ ‘affect[ing] subsequent [agency] acts,’ ” and having no “ ‘future effect’ ”) (second and fourth alterations in original) (quoting Sugar Cane Growers Coop. v. Veneman, 289 F.3d 89, 95-96 (D.C.Cir.2002)); see also William N. Eskridge, Jr. & Lauren E. Baer, The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from Chevron to Hamdan, 96 Geo. L.J. 1083, 1169-70 (2008) (arguing deference is most appropriate when agency process supports rule-of-law values). In sum, because the Coast Guard “abjure[d] the APA’s procedures for making decisions,” Krzalic, 314 F.3d at 882 (Easterbrook, J., concurring), and because the resulting unpublished Agency Decision on Remand does not promote traditional rule-of-law values, the court owes the agency’s interpretation of the GLPA nothing more than careful consideration. See, Skidmore, 323 U.S. at 140, 65 S.Ct. 161.
The court argues the Agency Decision on Remand is a “legislative regulation!] given controlling weight” because the Coast Guard acted pursuant to authority delegated to it by the GLPA. Maj. Op. 330. This is certainly true with respect to regulations promulgated after notice-and-comment rulemaking. But the Coast Guard’s regulations existed when we decided Menkes II; they are not the source to which we now look for the agency’s “forthright ... interpretation of the statute.” Menkes II, 486 F.3d at 1313. A mere nod to the delegating statute in the Agency Decision on Remand does not in itself trigger the application of Chevron. Otherwise magic words could defeat Mead’s metric for proper obligatory deference and a mere citation could turn the Agency Decision on Remand into one carrying the “force of law.” See Krzalic, 314 F.3d at 883 (“Chevron does not require courts to implement ‘interpretations’ that agencies announce without following the APA’s requirements for rulemaking: following forms is a condition attached to the delegation.”) (Easterbrook, J., concurring). Mead declared Chevron deference appropriate only where Congress both “delegated authority to the agency ... and ... the agency interpretation claiming deference was promulgated in the exercise of that authority.” 533 U.S. at 226-27, 121 S.Ct. *348 2164. Thus, under Mead, all expressly delegated agency action does not garner an Article III rubberstamp. If that were the case, we would have deferred to the Health Care Financing Administration’s PRO manual in Public Citizen, Inc. v. Department of Health & Human Services, 332 F.3d 654, 659-60 (D.C.Cir.2003), the settlement agreement in Southeastern Federal Power Customers v. Geren, 514 F.3d 1316, 1327 (D.C.Cir.2008) (Silberman J., concurring), and judges would apply Chevron to interpretations of the Sherman Antitrust Act by the Attorney General or interpretations of RICO by prosecutors, cf. United States v. Western Elec. Co., 900 F.2d 283, 297 (D.C.Cir.1990).
The court also says Chevron deference is owed under Barnhart v. Walton, 535 U.S. 212, 222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). Maj. Op. 331-32. But Walton is an odd case upon which to rely as it involved regulations promulgated after notice-and-comment rulemaking and clearly entitled to deference under Mead. Walton, 535 U.S. at 217, 122 S.Ct. 1265. Mead, of course, acknowledges Chevron may apply amidst more informal circumstance, but fails to elaborate further. Walton fills this doctrinal gap in dicta by suggesting various factors define Chevron’s applicability when notice-and-comment rulemaking does not occur. Yet I do not read Walton’s dicta to gut the framework Mead painstakingly constructed the year before — separating and sequencing questions concerning the deference owed an agency and those concerning statutory interpretation. This is especially true given Chevron’s approach — accepting “a range of permissible interpretations” and that “the agency is free to move from one to another” — calls into serious doubt Walton’s reliance on the vintage of an agency’s interpretation. Walton, 535 U.S. at 226, 122 S.Ct. 1265 (citing Rust v. Sullivan, 500 U.S. 173, 186— 87, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); Chevron, 467 U.S. at 863-64, 104 S.Ct. 2778).
In any event, the Walton factors do not “indicate that Chevron provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue.” Walton, 535 U.S. at 222, 122 S.Ct. 1265. First, the court suggests the GLPA authorizes the Coast Guard “to set parameters for voluntary associations.” Maj. Op. 331. But this conflates “voluntary associations” and “pilotage pools.” The statutory text only authorizes the Coast Guard to promulgate rules pertaining to the latter, not the former. 46 U.S.C. § 9304(b) (“For pilotage pools, the Secretary may — ....”) Furthermore, the GLPA enumerates five ways the Coast Guard may regulate pilotage pools, none of which include the authority to limit pilot-age pools’ composition — such as by requiring registered pilots to be members of a “voluntary association” — to anything but “United States registered pilots.” Second, the court argues deference is appropriate because the Agency Decision on Remand addresses “interstitial” questions, the potential ramifications of which could “impact[] myriad aspects of the regulatory scheme.” Maj. Op. 331. Of course, the pervasiveness of the court’s suggested ramifications implies the question presented does not fill a regulatory “gap,” but rather strikes at a keystone of regulatory design. Either way, the Coast Guard does not make this argument and there is no record evidence these “ramifications” will come to fruition. For starters, how the Association would apportion costs if it chose to dispatch non-members pro-rata remains a mystery. Further, these “ramifications” could only occur if non-association members' — -like Menkes — could free-ride, and Menkes offers to pay his “share of the costs,” which presumably includes the equivalent of an equity stake in the association and any sur-charge assessed *349 for dispatching the pilotage pool on a prorata basis. And even if the court’s predictions prove correct, the “interstitial” nature of the question presented is but one of Walton’s many non-dispositive factors. Finally, unlike this case, the regulations in Walton “reflect[ed] the Agency’s own longstanding interpretation.” 535 U.S. at 219, 122 S.Ct. 1265. The court’s insinuation the same is true here is risible. We remanded in Menkes II because the Coast Guard “did not have a forthright agency interpretation of the statute,” let alone an interpretation it consistently applied over time. The court accepts the agency’s bald assertion that its interpretation of “voluntary association” is longstanding. But the Agency Decision on Remand cites no previous agency decision articulating its interpretation and only cryptically refers to a past settlement between the agency and the pilots’ association, which pertained to the “wording of 46 C.F.R. § 401.720(b),” not § 9304 of the GLPA. Agency Decision on Remand at 9, J.A. 287.
In Menkes II, we characterized the Coast Guard’s varied interpretations as deriving from an “informal adjudication” with a sparse record and questioned whether deference would be owed such a proceeding under Mead. Menkes II, 486 F.3d at 1314. Unfortunately, remand was no remedy. The proceedings remain far-removed from “notice-and-comment process” and “other circumstances reasonably suggesting” the Coast Guard’s newfound interpretation has the “effect of law.” Mead, 533 U.S. at 230, 231, 121 S.Ct. 2164. The theoretical framework for administrative review assumes a structured, rule-of-law infused process. In reality, however, the process is often an ad hoc and idiosyncratic pastiche in which the rules, and the rules of engagement, can be distressingly protean. This case is a paradigmatic example. Regardless if the Agency Decision on Remand interprets Coast Guard regulations or the GLPA itself, deference is not appropriate.
Ill
The GLPA authorizes the creation of “a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services.” 46 U.S.C. § 9304(a). As the court concludes: “[i]t is not clear from the text of 46 U.S.C. § 9304 whether a voluntary association can decide to dispatch only its members, for the term ‘voluntary association’ is undefined.” Maj. Op. 333. To this extent, I agree. The term “voluntary association” is a changeling, capable of multiple meanings. But the absence of a statutory definition does not mean Congress failed to answer the question at issue. A careful analysis of the meaning commonly ascribed to “voluntary association,” § 9304(a)’s plain language, the broader statutory context, and the underlying purpose of the GLPA reveals a more precise meaning.
As a preliminary matter, an “association” is not “voluntary” if “membership ... is necessary, in a substantial sense, for the practice of one’s profession.” Ballentine’s Law Dictionary 1350 (3d ed. 1969). This definition comports not only with its legal usage at the time Congress passed the GLPA, see id. at 1350 (defining “voluntary association” as “[a]n association in which one may seek, or be accepted into, membership as a matter of choice.”) (citing 6 Am. Jur. 2d Associations and Clubs § 1), but also how courts utilize the term in the case law, see, e.g., Goldfarb v. Va. State Bar, 421 U.S. 773, 776, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (contrasting the Fair-fax County Bar Association, which “as a purely voluntary association of attorneys ... ha[d] no formal power to enforce” a bar requirement, with the Virginia State Bar, in which “membership ... is required *350 in order to practice in Virginia”); Lathrop v. Donohue, 367 U.S. 820, 832-33, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (plurality opinion) (noting that “integrated” bars arose because efforts to accomplish the desired ends “through voluntary association had not been effective”; “membership in the voluntary association ha[d] become static”); Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 796, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (Black, J., dissenting) (contrasting union-shop agreements with “[u]n-ions composed of a voluntary membership,” and explaining that “to the extent that Government steps in to force people to help espouse the particular causes of a group, that group — whether composed of railroad workers or lawyers — loses its status as a voluntary group”); In re China Union Lines, Ltd., 342 F.Supp. 426, 428-29 (E.D.La.1971) (characterizing a pilots’ association as a “purely voluntary private organization” where a member could be divested of his membership “and, yet, continue to retain his commission and work as a licensed Crescent River Port Pilot”); Firemen’s Pension Fund, by Smith v. Minnaugh, 80 Pa. D. & C. 297, 303 (C.P.Dauphin Cty.1951) (“The element of voluntary association is lacking in the Firemen’s Pension Fund. This fund was established by legislative mandate. Membership in the fund is involuntary and contributions thereto are made mandatory upon the paid members of the fire department.”). Thus in context, the term “voluntary association” means the Coast Guard has to provide pilotage services through registered pilots and can utilize voluntary associations to handle recruitment, training, and dispatch.
The language of § 9304(a), and the Coast Guard’s own interpretive regulations promulgated thereunder, do not support the Coast Guards’ interpretation, as neither equates “pilotage pools” from which registered U.S. pilots are dispatched, with “voluntary associations” potentially tasked with administering the dispatch of pilots from the pools. The statutory text says the Coast Guard “may authorize the formation of a pool by a voluntary association.” 46 U.S.C. § 9304 (emphases added). The court makes this same error, suggesting at times the SLSPA is a “pilotage pool,” Maj. Op. 323, and at times it is a “voluntary association,” Maj. Op. 321. Moreover, under existing Coast Guard regulations, voluntary associations “can establish” a pool or pools, thereby indicating the two terms are not interchangeable. 46 C.F.R. §§ 401.300, 401.320, 401.340(b). Indeed, at least one regulation (46 C.F.R. § 401.340) provides for the dispatch of non-member pilots from the pilotage pool and “grants the pilots’ association authority to deny the facilities and services of the pool to pilots refusing to agree to important terms for participation in the pool.” Agency Decision on Remand at 9-10, J.A. 287-88. Although the Coast Guard may be correct in arguing § 401.340 does not “explicitly address whether a pilots’ association must otherwise make the facilities and services of the pool available to nonmember pilots,” Agency Decision on Remand at 9, J.A. 287, it fails to recognize that § 401.340 implicitly does just that. If the reasons for denying a pilot dispatch are not limited to a refusal to pay or a violation of work rules, the association could refuse to dispatch a pilot on mere whim, without any specific rule authorizing its denial. Section 9304 suggests pilotage pools and voluntary associations are separate, distinct, and not coextensive. The Coast Guard’s own regulations support this point by outlining specific criteria governing when a voluntary association may deny registered pilots access to pilotage pools. Membership in a voluntary association is not the same as, and need not be a precondition for, membership in the pilot-age pool.
*351 The greater statutory context also sheds an interpretive light. Section 9303 requires U.S. registered pilots to meet certain “standards of competency.” 46 U.S.C. § 9303(a). If a pilot meets these “conditions for service,” id. § 9303(d), the Coast Guard must “issue ... a certificate of registration,” id. § 9303(b). In this respect, the GLPA promotes maritime safety by explicitly setting objective standards of qualification for registered U.S. pilots, including requiring applicants to “have a license as a master, mate, or pilot,” id. § 9303(a)(1), and to have at least twenty-four months’ experience operating towing vessels on the Great Lakes, id. § 9303(a)(2). Interpreting “voluntary association” in § 9304 to allow the association ultimate control over the dispatch process imposes an additional subjective and a-textual condition for employment of registered pilots — membership in the Association. It is no longer sufficient for an applicant to meet the regulatory “conditions for service” if he cannot also navigate the politics of the association. As a result, a certification process designed to focus on safety circuitously becomes one focused on sycophancy. Here, Menkes sought work through the Association as a non-member. The SLSPA refused to dispatch him, however, and even informed the Canadian pilot association that Menkes could not be dispatched in District One despite his standing as a registered U.S. pilot. See letter from Roger S. Paulus, President, St. Lawrence Seaway Pilots’ Association, to Robert Lemire at (March 26, 2004), reprinted in J.A. 62.
The Agency, in contrast, relies on a series of descriptions gleaned from a general encyclopedia of law, American Jurisprudence, to support its argument that allowing the SLSPA to compel membership and screen pilots before dispatching them to work on the Great Lakes is consistent with the way “voluntary” is used in the statute. Agency Decision on Remand 12, J.A. 290. The court capitulates, swept away by the under-current of a powerful deference regime. I find Chevron’s ebb tide less beguiling. Why would the government delegate authority to a voluntary group, operating without constraints, to have complete power over someone’s livelihood? The Association could impose a rule by nepotism, or discriminate on the basis of race, gender, religion, or just plain cussedness, insulated from constitutional scrutiny only by the porous and symbolic distinction between state and private action. In any event, American Jurisprudence did not always define “voluntary association” in this way. During the time Congress passed the GLPA, as well as in the decades following, the encyclopedia read:
The term “voluntary” is frequently used in connection with the term ‘association’ or ‘society,’ and some principles of law are confined, in their operation, to ‘voluntary’ organizations. In this connection, the term means simply that the organization is one in which one may seek, or be accepted into, membership in the organization as a matter of choice. If membership is required by legislative mandate, as in the case of public officers or employees, such an organization is not a ‘voluntary’ organization.
6 Am. Jur. 2d Associations and Clubs § 1 (1963); see 6 Am. Jur. 2d Associations and Clubs § 1 (2007) (same).
Allowing the Association exclusive control over the composition of pilotage pools also creates an odd incentive and undermines the safety-promoting purpose of the GLPA. Recall, when the association has a “physical or economic inability to [provide service],” the Coast Guard may order “any U.S. registered pilot to provide pilotage service.” 46 C.F.R. § 401.720(b). Thus, to maintain control, the Association must be able to provide adequate service. Be *352 tween the 2001 and 2003 navigation seasons, the Association faced an attrition problem which left it physically unable to provide adequate pilotage service. The court suggests the SLSPA was not responsible for the pilot attrition problem. This may be true. But I do not understand its relevance. If the association’s service is not adequate, the Coast Guard can act. Moreover, to the extent the attrition problems resound from issues with recruitment, training, and pilot compensation, they suggest the SLSPA was responsible. The Association solved its attrition problem by hiring both contract pilots, including one who “had never been certified as an independent pilot,” J.A. 357, and new pilots who had not finished the statutory required training and needed “to receive a temporary registration permitting them to go pilot boat to pilot boat while continuing their training for ports,” J.A. 311. Thus, in lieu of a registered pilot with over thirty years’ experience, seasoned and intimately familiar with the water in which he works, the Association dispatched pilots with the equivalent of learners’ permits to maintain exclusive control over the pilotage pool.
The court upholds the reasonableness of the agency’s interpretation at Chevron step two by focusing on various perceived gains in efficiency. Notably, the court accepts the Coast Guard’s rationale that allowing “voluntary associations” to exclude registered pilots from the pilotage pool (1) “ ‘removes the Director from day to day involvement’ (2) “ ‘allows the pilots’ associations ... to apply their expertise’ and (3) “ ‘promotes retention of pilots, by giving the pilots in the association some control over decisions that will affect the financial health of the pilots, the pilots’ association and other entities that may provide infrastructure support to the pilots.’ ” Maj. Op. 332 (quoting Agency Decision on Remand at 15, J.A. 293).
Of course, the Director’s removal from day-to-day operations would occur whether the association dispatches non-members or not. It is also difficult to defend the Association’s monopoly power as efficiency producing when applying more exacting scrutiny. Generally speaking, market competition — not cartels — produce efficiency gains and public benefit, which in this context may mean the dispatch of more experienced pilots and greater overall safety. Cartels, on the other hand, improve the profitability of their own participants. Or, as the Coast Guard might say: “ ‘giv[e] the pilots in the association some control over decisions that will affect the financial health of the pilots.’ ” Maj. Op. 332 (quoting Agency Decision on Remand at 15, J.A. 293).
Finally, although I agree Menkes v. St. Lawrence Seaway Pilots’ Ass’n, 269 Fed. Appx. 54, 55 (2d Cir.2008), precludes Menkes’s First Amendment claim, I do not think the underlying constitutional issues — if properly presented — are so clear cut. The canon of constitutional avoidance therefore also cautions against the Coast Guard’s statutory reading. See Clark v. Martinez, 543 U.S. 371, 385, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (“The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them.”) (emphasis omitted) (citing Almendarez-Torres v. United States, 523 U.S. 224, 237-38, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); United States ex rel. Attorney General v. Del. & Hudson Co., 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909)); Rust v. Sullivan, 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (discussing constitutional avoidance as a means of circumventing “grave and doubtful constitutional questions.”). By raising constitutional *353 avoidance I do not mean to suggest a constitutional violation has occurred; nor that “grave” constitutional questions persist. This is not a case in which competing interpretations are in equipoise. I invoke constitutional avoidance in the alternative only to suggest the constitutional question is not as simple as the court makes it seem; to the extent the canon colors interpretation of the statute, its gloss does not favor the Coast Guard’s reading.
The court relies upon “agency shop” cases for the proposition that the Coast Guard can compel Association membership as a condition of employment. Maj. Op. 333-34. This reliance strikes me as misplaced. Unlike “agency shop” cases, no “free-rider” problem exists here. See Keller v. State Bar of Calif., 496 U.S. 1, 12, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990) (“The reason behind the legislative enactment of ‘agency-shop’ laws is to prevent ‘free riders.... ’ ”); Abood v. Detroit Bd. of Educ., 431 U.S. 209, 221-22, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (“A union-shop arrangement ... counteracts the incentive that employees might otherwise have to become ‘free riders,’ to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees.”). Captain Menkes offers to pay his “share of the expenses,” Or. Arg. 32:57-33:00, and the Association does not dispute he did so during the 2001, 2002, and 2003 navigation seasons.[4] In addition, the government’s interest here— regulating pilotage — does not justify impinging Menkes’s First Amendment rights in the same manner as the government’s interest in the “agency shop” cases. Exclusive union representation “is a central element in the congressional structuring of industrial relations.” Abood, 431 U.S. at 220, 97 S.Ct. 1782. Utilization of a voluntary association, by comparison, is not mandatory; the Coast Guard’s authorization to do so is discretionary.
The more apt analog is the Supreme Court’s professional licensure cases. In Schware v. Board of Bar Examiners of New Mexico, a State Board of Bar Examiners prohibited an applicant from sitting for the bar exam because he was previously a member of the communist party. 353 U.S. 232, 234-35 & n. 2, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). The Court held the act unconstitutional under the Due Process Clause, reasoning the state bar association could not exclude an individual from the practice of law because the individual failed to satisfy a “standard[ ] of qualification” having no “rational connection with the applicant’s fitness or capacity to practice [a given trade].” Id. at 238-39, 77 S.Ct. 752; see also Dent v. State of West Virginia, 129 U.S. 114, 124, 9 S.Ct. 231, 32 L.Ed. 623 (1889) (upholding medical licensing requirements because the requirements were not arbitrary). Applied here, Schware and Dent serve a useful warning. Wielding the government’s imprimatur, the “voluntary association” can arbitrarily exclude qualified pilots from working on the Great Lakes. The court suggests *354 Menkes did not raise this point. Maj. Op. 334. But this is just wrong. Throughout this litigation, Menkes alleged the SLSPA engaged in nepotism and arbitrary membership decisions. See, e.g., Menkes Aff. ¶ Exhibit A, reprinted in J.A. 159. Of course, arbitrary exclusionary practices have not always sounded constitutional alarms in the context of tug-boat pilotage. In Kotch v. Board of River Port Pilot Commissioners for Port of New Orleans the Court approved regulations condoning nepotistic hiring of river boat pilots, allowing in effect the exclusion of applicants on the basis of race, gender, or religion. 330 U.S. 552, 565, 67 S.Ct. 910, 91 L.Ed. 1093 (1947) (“Blood is, in effect, made the crux of selection.”). Curiously, the state justified its regulations on a “relationship to the end of securing an efficient pilotage system” there too. Id.
In sum, I do not read the term “voluntary” to compel Association membership. This interpretation comports with the common definition of the term “voluntary association,” the plain language of § 9304, the surrounding statutory context, and the underlying purpose of the GLPA. It also avoids constitutional implications which may occur when the Government condones the use of arbitrary means of excluding individuals from their chosen profession. Even applying Chevron’s deferential standard, I would reverse the district court in part, holding the Coast Guard’s interpretation of § 9304 as unreasonable and “contrary to law.” 5 U.S.C. § 706(2).
IV
In Menkes II, the Coast Guard’s inability to explain its actions was troubling. The court went to considerable lengths to suggest the appropriate seriousness with which the agency should have approached the opportunity to clarify itself on remand. This is not an easy case. Nor should it be. It ought to be difficult to conclude Congress condoned the establishment of a cartel or guild unfettered by the strictures of the APA to which the responsible federal agency would be subject. What public interest does ceding so much power to the Association serve? Why should the Association be free to act arbitrarily and capriciously when the Coast Guard clearly could not? On remand, the Coast Guard apparently eschewed judgment in favor of justification. In the process, the agency jettisoned even the most minimal procedural safeguards designed to ensure it acted in a “fair and considered” manner. Consequently, I do not believe deference is due.
Pilotage on the Great Lakes is a difficult and dangerous job. Those who choose it as a profession often come from a certain proud lineage. The GLPA regulates the profession by setting out safety requirements and other responsibilities for the Coast Guard to administer. For example, if it so chooses, the Coast Guard “may authorize the formation of a pool by a voluntary association ... for efficient dispatching of vessels and rendering of pilot-age services.” 46 U.S.C. § 9304. I do not read this language to allow the “voluntary” association to compel membership in its organization before dispatching pilots. Such an interpretation seemingly conflicts with the definition of “voluntary association,” the statute’s plain language, broader context, and underlying purpose. But reading the statute in this way, the Coast Guard places the government’s imprimatur behind the Association, providing it monopoly power over District 1 pilots, and allowing the Association to exclusively set the conditions under which pilots may work. Granted, the Supreme Court previously condoned a similarly arbitrary and discriminatory exercise of state power against constitutional attack; and it did so in the context of river boat pilots, a profession that shares more with Great Lakes pilotage than just its nautical roots. See Kotch, 330 U.S. at 565, 67 S.Ct. 910. But I *355 am confident that decision is a relic of a time past, now serving only as a historical bookmark, rather than a contemporary statement of the law. The court’s deference makes me question whether I am too optimistic.

. I dissent only from the court’s resolution of Menkes’s APA claim.

. The court argues J.P. High’s regulatory interpretation “displaced Flyntz’s.” Maj. Op. 332. But High affirmed Flyntz's decision, although he did so on alternate grounds. See Letter from J.P. High, Director of Waterways Mgmt., to Mark Ruge, Preston, Gates, Ellis & Rouvelas, Meeds LLP at 2-3 (May 22, 2001), J.A. 126-27. High did not expressly reject Flyntz's interpretation or even implicitly suggest it was not the agency's governing regulatory reading. Id. The fact remains, the Coast Guard's regulatory interpretation is far from "long standing.” Maj. Op. 332. The Agency Decision on Remand cites no previous agency decision articulating its interpretation. Nor does the Coast Guard point the court to such authority on appeal.

. See, e.g., The Bluebook: A Uniform System of Citation 218-28 (Columbia Law Review Ass’n et al. eds., 19th ed. 2010) (providing a nonexclusive list of over thirty different agencies, and their various sub-branches, which publish their administrative decisions).

. The court says Menkes "did not offer to purchase the equity stake ... that members are required to purchase." Maj. Op. 335. It is true Menkes objects to the requirement that he purchase stock in Seaway Pilots, Inc., which owns the pilot boats. But the relevant Coast Guard regulations allow the voluntary association to "bill for services,” 46 C.F.R. § 401.340(b), and registered pilots must "comply with [the association’s] working rules,” id. § 401.340(a). Menkes signed a "written authorization” agreeing to do just that. At oral argument, Menkes reiterated he would pay his "share of the expenses.” Or. Arg. 32:57-33:00. It does not follow from Menkes's objection that his "share” does not include any marginal fixed costs incurred by Seaway Pilots, Inc. on-top of whatever operational costs incurred by the Association when Menkes is dispatched. The regulations allow the inclusion of such costs when the Association bills Menkes.